Present findings accordingly.

---

HOWARD et al. v. CITY OF BUFFALO et al.

(Supreme Court, Appellate Division, Fourth Department. May 1, 1912.)

Appeal from Special Term, Erie County.

Action by Gibson Howard and another against the City of Buffalo and others. From a judgment for plaintiffs against all defendants. (122 N. Y. Supp. 1095), defendants appeal. Affirmed.

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

L. L. Babcock, of Buffalo, for appellants Delaware, L. & W. R. Co., New York, L. & W. Ry. Co., New York, C. & St. L. R. Co., and South Buffalo Ry. Co.

Frank Rumsey, of Buffalo, for appellants Pennsylvania R. Co. and Western New York & P. Ry. Co.

William L. Marcy, of Buffalo, for appellants Erie R. Co. and Buffalo Creek R. Co.

William B. Hoyt, of Buffalo, for appellant Lake Shore & M. S. Ry. Co.

James S. Havens, of Buffalo, for appellant Buffalo, R. & P. Ry. Co.

George E. Pierce, of Buffalo, for appellant City of Buffalo.

Arthur C. Wade, of Jamestown, and Edward C. Randall, of Buffalo, for respondents.

PER CURIAM. Judgment and order affirmed with costs, upon the opinion of BROWN, J., delivered at Special Term. All concur, except KRUSE, J., who dissents in an opinion, and FOOTE, J., who dissents.

KRUSE, J. (dissenting). The judgment awarded requires the city of Buffalo and certain of the defendant railroad companies to undo certain things which, as is claimed, turn out of their natural course the flood waters of Buffalo river and Cazenovia creek, and obstruct the waters of Howard creek, casting the waters upon the plaintiffs' premises, known as the "Howard farm," situate in the southwestern part of the city, about a mile from Buffalo river and a half mile from Lake Erie. Howard creek (so called) runs westerly across the premises towards the lake. The judgment also awards damages so done in the past.

1. I think the injunctive relief awarded the plaintiffs against the city is unwarranted in law and impracticable, and, even if carried out strictly, will not prevent the flood waters from reaching the plaintiffs' land. The judgment requires the city to restore the so-called flood channel of Buffalo river, across Abbott road, for a distance of about a mile, to the same condition as before the street was paved in 1892. That means, as I understand it, that the pavement must be taken up, the Lackawanna viaduct removed or rebuilt, and the old plank road grade, with ditches on either side of the roadway and connecting sluices underneath, restored. If that is done, the water will overflow elsewhere, for the natural channel of the river has always been too small to hold the water in flood times, and, however serviceable the ditches may have been in the past, I am satisfied that they would not now hold the flood waters, and the sluices under the roadway would facilitate the flow of water, which is now obstructed by a solid embankment. Besides, the plank road grade in some places was even lower than the present grade at the lowest point, and, if the grade is to be raised to the highest point of the old plank road grade and as high as the banks downstream below Abbott road, the overflow will

be increased at points farther upstream. That the water will overflow in flood times and reach the plaintiffs' land, although a mile away from Buffalo river, seems reasonably certain. The natural slope is from the river and creek towards the plaintiffs' land, the fall being about one foot in a thousand, and, even with the grade as it is now, the Cazenovia creek has overflowed just above its junction with the river and the water run along and to the south of Abbott road. Moreover, the railroad ditches below Abbott road, which connect the plaintiffs' land with the river, are so much lower than the grade of Abbott road that the flood waters, it would seem, would reach their land by that means before they overflowed the Abbott road grade, if the ditches are kept open, as the plaintiffs insist they should be. But above and beyond these considerations I think the city had the right to grade and improve the street. It certainly could not be expected that a pavement would be laid upon this irregular and uneven plank road grade, with ditches on the side and underneath; and, unless it was negligent, the city is not liable for the consequences resulting therefrom. Not only did the city have direct legislative authority for doing what it did, but the Legislature has from time to time made provision for abating the floods (Laws of 1891, c. 105, § 405, as amended by Laws of 1900, c. 571, § 1), and, finally, declared the condition a nuisance, and made it mandatory upon the city to abate the flood conditions (Laws of 1906, c. 527). The city has adopted a plan for enlarging the channel of the river, has spent hundreds of thousands of dollars in that work, and is now actively engaged in carrying forward the work; and it is reasonably certain that within two years time, perhaps less, the work will have so far progressed as to entirely prevent the overflow of the flood waters to a point up the river beyond Abbott road.

I think the city should not now be hampered with this injunction. It is true that the injunctive relief is suspended for a reasonable time, to carry out that plan, but Buffalo river is a navigable waterway, is so recognized by both the state and the nation, and just what changes may be made in improving the river cannot now be foreseen. As the situation now is, with the work in progress, the most the plaintiffs can require, as it seems to me, is that the work shall be prosecuted with reasonable diligence. If the plaintiffs have no remedy under that act, I think they have no remedy at all. The Legislature has provided for abating the floods, and the plan adopted is the only effective way yet devised.

2. What has been said regarding the liability of the city applies largely to the liability of the railroad companies. They had the right to construct their railroads over the river, and the question is whether they are at fault in the way in which they built the approaches and bridged the river. If not, no liability exists for the resulting consequential damages. Bellinger v. New York Central Railroad, 23 N. Y. 42; Moyer v. N. Y. C. & H. R. R. R. Co., 88 N. Y. 351; Gordon v. E. & K. R. R. Co., 195 N. Y. 137, 88 N. E. 14. In bridging the river the railroad companies were required to use reasonable care and foresight not to obstruct the channel of the river or unnecessarily inter-

fere with the flow of the waters thereof. Their duty, as it has been expressly declared by statute since 1850, is to restore the stream or water course which the railroad intersects or touches to its former state, or to such a state as not to have unnecessarily impaired its usefulness. Laws 1850, c. 140, § 28, subd. 5; now embodied in chapter 49 of Consolidated Laws (Laws of 1910, c. 481) § 21.

It is contended by the plaintiffs that the channel under the bridges has been obstructed and its carrying capacity lessened, while the railroad defendants contend that although piers and abutments were built to support the bridges, as was necessary, the flow of the water operating under natural laws immediately re-established what is known as the regimen of the stream, increasing by erosion the channel so that the cross-sectional area is the same as before and as large as immediately above and below the bridges; that, in fact, the channel has been deepened under every bridge. However that may be, the judgment requires, not only the enlargement of the openings under the several bridges, but as well the removal of the embankments and approaches to their several bridges and making openings in the embankments sufficient to permit the flow of a certain volume of water under certain conditions specified. Whatever else may be said of the injunctive relief, I think to remove and open up the solid embankments and approaches to the bridges is unwarranted, and would be ineffective to keep the waters from the plaintiffs' land, and for reasons which have already been stated, relating to the injunctive relief awarded against the city. The waters would be blocked by the improvements below and be cast upon or over the lands which are lower. Even if every building and improvement on either side of the river were removed, as far up the river as above the Abbott road, so as to make a flood channel from 500 to 1,500 feet wide, as described in the decision, the flood waters would still find their way to the plaintiffs' lowlands, as has been pointed out.

If there is any liability here at all, it rests upon the doctrine that one may not so use his own as to encroach upon the legal rights of others. The application of that principle must be determined largely by the rules of public policy—what would best conserve public interests as a whole. A distinction has been made between surface waters and the waters of a natural water course, pointing out the difference between the civil law and the common law in that regard (Barkley v. Wilcox, 86 N. Y. 140, 40 Am. Rep. 519), although it has been said by high authority that both rules rest upon substantially the same principles (Boyd v. Conklin, 54 Mich. 583, 20 N. W. 595, 52 Am. Rep. 831). According to the findings, this stream has three channels or stages of importance, as it is said—low-water channel, bank-full channel, and flood channel. The latter is stated to be from 500 to 1,500 feet wide, with well-defined banks. While it may be true, as the findings indicate, that there are irregular elevations of land at certain points along the course of the stream, it is evident that they are not so connected as to hold the flood waters within these bounds. Usually the periodical floods have extended in a solid, moving mass, far beyond this so-called flood channel.

I do not think it is the law that the channel of a stream comprehends the entire area covered by a moving mass of flood water within which the flow must not be interfered with to the detriment of the lands beyond this area. If so, a much larger territory than the flood channel as here described and defined must be withdrawn from use and permitted to lie in a state of nature. Such a rule, rigidly applied, would prevent the upbuilding of the river valleys of the country, in many of which, like the Mississippi, the flood waters have moved along the course of the river in a solid mass, many miles in width; and to a large extent would have prevented the upbuilding of South Buffalo along the river and creek. Many streets besides Abbott road would be affected, which are now built up with residences, manufacturing plants, and other improvements. Both sides of the river from the lake to above Abbott road have been largely built up and the banks of the river diked and raised, all of which must be torn down and removed, if this so-called flood channel must be cleared and reduced to its former natural state. That, as it seems to me, is the logical effect of the decision. I do not say that flood waters moving and connected with the main current of the stream may not, under certain conditions and within certain limitations, be. regarded as waters of the stream and the rules of water courses applicable thereto, although outside the ordinary channel of the stream; nor that the owners of lands in making improvements along this stream may not have encroached upon the legal rights of others. But the question now under consideration is whether, in view of the statute authorizing the railroad defendants to construct their railroads, and bridge the stream, they have been at fault in the way that has been done, to the detriment of the plaintiffs, and, if so, to what legal redress the plaintiffs are entitled.

I think the plaintiffs are not entitled to the money judgment which has been awarded to them, for reasons which I will state later; nor to the injunction, the logical effect of which has been pointed out, and which, if carried out, would cast the waters upon the lands of others, who are not now parties to this action, and would not, as I think, relieve the plaintiffs' premises from the overflow.

3. As regards Howard creek: I have no doubt that originally there was a living stream, having its source in springs about a mile or more from the lake, flowing in a westerly direction over the plaintiffs' premises, the waters eventually finding their way into the lake. But there is not much left of its characteristics as a stream. The depression remains as far as the railroad embankments, but beyond there is little, if any, indication of a water course, and the waters, before reaching the plaintiffs' premises, have been largely intercepted and drained into city sewers, except when there is an overflow in flood times. The only useful purpose which the channel would now serve is that of drainage; and I do not see how that would be effective, except for the railroad ditches. Even before the embankments were built, whatever waters of Howard creek found their way from the lowlands and swamps to a point west of the present railroads were intercepted by the Tifft farm ditches, which connected with the Buffalo river. But

beyond that I think that, when the plaintiffs' predecessors in title conveyed the strips of land to the various railroads for railroad purposes, it was contemplated that the waters of Howard creek should be intercepted and drained into the river by ditches to be constructed by the railroad companies, and that the channel across the rights of way might be closed. The embankments have benefited rather than harmed the plaintiffs' premises, for they have kept off the lake waters which swept through the open culverts from the lake and periodically submerged the plaintiffs' lands, with the other lowlands in this vicinity. I think the ditches were intended to take care of the waters of the creek with that of the other drainage.

While the plaintiffs are entitled to redress for the failure upon the part of any of the railroad defendants to fulfill their obligations respecting the ditches, so far as they serve any useful purpose in connection with the lands now owned by the plaintiffs, I think they are not entitled to a mandatory injunction requiring the railroad companies to open the Howard creek channel under the embankments.

4. As regards the damages: The damages awarded cover the six years before the commencement of the action and the four years thereafter, up to the time of the trial, allowed at the rate of $550 a year, amounting to $5,500. They were apportioned against the several defendants according to the damage done by each, as it is claimed, awarding $600 against the city and amounts ranging from $300 to $1,700 against eight of the defendant railroad companies, besides a proportionate amount of the costs against each of the defendants so held liable; the trial court holding that the defendants were not jointly liable, but each liable only for the damages done by it, following the rule of the O'Donnell Case. O'Donnell v. City of Syracuse, 184 N. Y. 1, 76 N. E. 738, 3 L. R. A. (N. S.) 1053, 112 Am. St. Rep. 558, 6 Ann. Cas. 173.

The damages awarded seem to be the loss in rental value of the land overflowed from the flood waters, which according to the testimony of one of the witnesses is a depreciation annually of from $500 to $600. But the evidence seems to indicate that, if there was any liability at all, the acts of others than those who are made parties to this action caused in part or contributed to the conditions for which the plaintiffs seek to recover damages. If so, it was improper to charge all the damages against these defendants; and, even if they were liable, it would not justify making an arbitrary division of the damages among several defendants merely because they were incapable of separation and the proportions of liability could not be established, as was held in the O'Donnell Case, supra, and, besides, the drainage ditches on plaintiffs' land have not had the same care and attention since the death of the former owner as before.

I think the evidence fails to sustain the award of damages, either in gross against all the defendants, or the amount apportioned against each of them.

I think the judgment should be reversed, and a new trial ordered.